

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CHRISTINE POLITIS       ) | |
|        **Plaintiff,**    ) | **Case No. 04 C 2463** |
|           ) | |
|      **v.**         ) | **Magistrate Judge Geraldine Soat Brown** |
|           ) | |
| JO ANNE B. BARNHART,    ) | |
| COMMISSIONER OF        ) | |
| SOCIAL SECURITY,       ) | |
|        **Defendant.**    ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christine Politis ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security ("Commissioner"). [Dkt 1.] Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on October 1, 2001. (R. 19, 51-53.)[1] Plaintiff's claims were denied initially and upon reconsideration (R. 28, 29, 30-34, 36-39), and a hearing was held before an Administrative Law Judge ("ALJ") on February 7, 2003. (R. 21, 170.) The ALJ issued an unfavorable decision on March 21, 2003 (R. 13-20), and the Appeals Council declined Plaintiff's request for review (R. 6-8), thereby making the ALJ's decision the final decision of the Commissioner. The parties have filed cross-motions for summary judgment [dkt 17, 20], and have consented to the jurisdiction of a magistrate judge under 28 U.S.C. 636(c) [dkt 12, 13]. For the following reasons, Plaintiff's motion is denied and the Commissioner's motion is granted.

---

[1] The regulations regarding DIB and SSI are substantially similar and where they do not significantly differ, only one section will be cited. *See Ashpaugh v. Apfel*, No. 98 C 6561, 2000 WL 1222153 at *1 n. 3 (N.D. Ill. Aug. 22, 2000) (Ashman, M.J.). However, the documents regarding Plaintiff's application for SSI were not included in the record. (R. 4.)

## BACKGROUND

Plaintiff claims that she became disabled on June 12, 2001, due to a hearing impairment. (R. 51, 67.) Plaintiff was born on November 18, 1956 and was 46 years old at the time of the hearing. (R. 51, 176.) She has a high school education. (R. 176.) From 1977 to 1996, Plaintiff worked as an office clerk/filing clerk. (R. 77, 180.) In that position, Plaintiff filed and sorted paperwork and delivered it to different departments. (*Id.*) From 1997 to 2001, Plaintiff worked as a file clerk and mail sorter. (R. 78, 179.) In that position, Plaintiff ran the mail room and mail machines and took the mail to the mailbox. (*Id.*) She also made copies and filed. (*Id.*) Plaintiff apparently worked from July 28, 2002 to August 10, 2002 at the Family Dollar, Inc. (R. 160-161, 177-78.) For about six weeks from approximately September 2002 to November 2002, Plaintiff worked in some capacity for the federal government in the mail room at either the Dirksen Federal Building or the Kluczynski Federal Building. (R. 162-63, 178-79.) At the time of her hearing, Plaintiff had been working part-time for a few weeks as a bagger at Jewel Food Stores. (R. 164-65, 176-77.)

### A.    Medical Evidence

On November 7, 1965, when Plaintiff was about nine years old, she was admitted to the Illinois Eye and Ear Infirmary because of congenital right auricular (lop ear) deformity.[2] (R. 134-35.)[3] The medical records from this admission show that, at that time, Plaintiff had bilateral

---

[2] Lop-ear is a congenitally deformed external ear (pinna) marked by a poorly developed helix and anthelix. J. E. Schmidt, *Attorneys' Dictionary of Medicine*, Vol. 3, L-179 (Matthew Bender, Nov. 2004).

[3] Unfortunately, some of the handwritten notes from this hospitalization are illegible. (R. 140-41.)

2

sensorineural hearing loss.[4] (R. 134.) On November 11, 1965, Plaintiff underwent right otoplasty surgery.[5] (R. 134, 136.)

From January 1966 until September 1975, Plaintiff received treatment from an otolaryngology[6] clinic and speech and hearing center. (R. 145-49, 152, 158.)[7] At some point, Plaintiff began having problems with the hearing in her left ear. (R. 146.) In 1966, Plaintiff's doctors opined that she required speech evaluation, an audiogram[8], and a hearing aid evaluation. (R. 145-46.) Plaintiff eventually received a hearing aid for her left ear. (R. 146, 147.) In March 1966, Plaintiff's left ear showed a Speech Reception Threshold (SRT)[9] of 46 dB[10] unaided and 10 dB when wearing her hearing aid. (R. 146.) In 1968, Plaintiff was reevaluated and, at that time, the doctor's impression was that Plaintiff had bilateral sensorineural hearing loss that was worse on the left side. (R. 147.) Audiologic testing done in August 1975 suggested bilateral sensorineural hearing loss,

---

[4] Sensorineural hearing loss is an impairment of hearing caused by a disorder of the nerves or structures of the inner ear. *Id.*, Vol. 5, S-105.

[5] Otoplasty is plastic surgery of the external ear for the reconstruction of a deformed ear. *Id.*, Vol. 4, O-132.

[6] Otolaryngology is the branch of medicine or surgery which deals with the diseases of the ear, the nose, and the throat and larynx. *Id.*, Vol. 4, O-131.

[7] Unfortunately, some of these records are illegible.

[8] An audiogram is a graphic chart or tracing showing the variations in the sharpness of hearing, of an individual, with regard to sounds of different frequencies. *Id.*, Vol. 1, A-617.

[9] The SRT is sometimes referred to as the speech-reception threshold. The objective of this measure is to ascertain the lowest level at which speech can be identified at least half the time. Http://www.emedicine.com/ent/topic371.htm

[10] dB is an abbreviation for decibels. A decibel is a logarithmic unit that is a ratio between a reference level and a measured level. *The Merck Manual of Diagnosis and Therapy*, 17th ed., Section 7, Chapter 82, http://www.merck.com/mrkshared/mmanual/section7/chapter82/82b.jsp.

specifically, moderate hearing loss in Plaintiff's left ear with good discrimination[11] for speech, and severe hearing loss in her right ear with poor discrimination for speech. (R. 158.)

Plaintiff provided no medical records of treatment from September 1975 until her evaluation at the request of the Bureau of Disability Determination Services ("DDS") on November 30, 2001. On that date, Plaintiff underwent an otologic and audiologic evaluation by Dr. Jack D. Clemis in connection with her claim. (R. 111-12.) Dr. Clemis noted that Plaintiff's voice is audible and sustainable with some articulation errors that are secondary to long-standing hearing loss. (R. 111.) Plaintiff told Dr. Clemis that she had been wearing a hearing aid in her left ear since she was nine years old. (*Id.*) Prior to that evaluation, Plaintiff's last hearing evaluation was approximately three years earlier. (*Id.*) However, Plaintiff received a hearing aid from the Sertoma Center approximately one year prior to the evaluation by Dr. Clemis. (*Id.*) The audiogram measured severe sensorineural hearing loss in Plaintiff's left ear and profound loss in her right ear. (*Id.*) Due to the severity of the hearing loss, Dr. Clemis was unable to measure any speech functions in Plaintiff's right ear. (*Id.*) In Plaintiff's left ear without the use of her hearing aid, Dr. Clemis obtained an SRT of 60 dB, with good (80%) speech discrimination ability. (*Id.*) However, with her hearing aid fitted in her left ear, Dr. Clemis obtained an SRT of 35 dB and good (80%) speech discrimination ability. (*Id.*) An examination of Plaintiff's ear, nose, throat, head and neck showed no apparent disorders. (*Id.*) Based on his examination, Dr. Clemis opined that Plaintiff has severe sensorineural hearing loss in her left ear and profound sensorineural hearing loss in her right ear. (R. 112.)

---

[11] Speech discrimination is the ability to discriminate among the various speech sounds or phonemes. The percentage of words correctly repeated by the patient is the speech discrimination score, normally 90 to 100%, and is a good indication of a person's ability to understand speech under ideal listening conditions. *Id.*

4

On December 18, 2001, Dr. Young-Ja Kim, a state agency physician, completed a residual functional capacity ("RFC") assessment form for Plaintiff. (R. 114-21.) His assessment was that Plaintiff has no exertional limitations, no postural limitations, no manipulative limitations, and no visual limitations. (R. 115-17.) However, Dr. Kim noted that Plaintiff has communicative limitations because of her hearing and should avoid concentrated exposure to noise. (R. 118.) Dr. Kim reported that the current findings show profound hearing loss in Plaintiff's right ear, such that speech functions could not be measured. (*Id.*) Dr. Kim also reported that Plaintiff's left ear measures an SRT of 60 dB and good speech discrimination ability when unaided, and 35 dB and good (80%) speech discrimination ability when aided by her hearing aid. (R. 118, 121.) Dr. Kim further noted no disorders on Plaintiff's ear, nose, throat, head and neck. (R. 121.) An additional RFC assessment form dated February 8, 2002, prepared by Dr. Kim, mirrors all of the information and findings from the December 18, 2001 assessment. (R. 122-29.)

On January 31, 2002, Plaintiff had a personal interview with the SSA. (R. 97.) The SSA interviewer observed that Plaintiff had difficulty hearing and wore hearing aids. (R. 96.) The SSA interviewer noted that Plaintiff was pleasant, cooperative and casually dressed. (*Id.*) Plaintiff testified that she had a friend accompany her to the office because Plaintiff had already been there twice without understanding and her friend could explain things to her. (R. 96, 185.)

## B.    Plaintiff's Testimony at the Hearing

At the hearing before the ALJ, Plaintiff elaborated about her work experience, some of the problems she experiences, and how her hearing loss has impacted her life. Regarding work, Plaintiff testified that she was hired by Family Dollar for a temporary position to stock shelves for the store's

grand opening. (R. 177-78.) She testified that she could stock shelves for 40 hours a week if the position were available. (R. 178.) Plaintiff testified that in her current position as a bagger, Jewel gives her only 12 to 18 hours a week, but she could bag groceries for 40 hours a week if given the hours. (R. 177.) However, Plaintiff explained that she sometimes has difficulty working as a bagger if the cashier does not look at her to tell her the customer wants a brown bag or double bag. (R. 181-82.) She testified that a week before the hearing she was bagging groceries in a plastic bag, but the cashier wanted her to use a different bag. (R. 181.) She explained to him that she needed him to look at her so she would understand what he was saying. (R. 181-82.) After she explained that to him, he tried to look at her but sometimes forgot, and she would remind him. (R. 182.)

Regarding her limitations, Plaintiff testified that she has difficulty hearing and understanding when more than one person talks at the same time. (R. 184.) In that situation, she has to look at the person's mouth to understand what the person is saying. (*Id.*)

Regarding her living arrangements, Plaintiff testified that she has lived by herself for three years. (R. 181.) Prior to that, she lived with her mother. (R. 181, 183.) When they lived together, Plaintiff's mother handled all of her phone calls. (R. 183.) Plaintiff testified that she has some trouble using the phone now that she lives alone. (*Id.*) However, at one point Plaintiff testified that she is doing a good job using the phone, but then her next statement was that she is having a hard time using the phone. (*Id.*) She testified that she has difficulty making appointments over the phone or hearing on the phone because people do not talk loud enough. (*Id.*) Plaintiff has to repeat herself or ask the other party to repeat. (*Id.*) She testified that she has a loud phone but not a special phone. (*Id.*)

6

## C. Irma Arreguin's Testimony

Plaintiff called Irma Arreguin to testify on her behalf before the ALJ. (R. 185-90.) Arreguin worked with Plaintiff for about 20 years at Warshowsky Auto Parts, where Arreguin was a clerical typist and Plaintiff was a filing clerk. (R. 186.) They worked together everyday when Plaintiff picked up work from Arreguin's desk and distributed it to other departments. (R. 187.) Arreguin testified that Plaintiff did a good job, but that Arreguin had to explain to her how to do the work. (*Id.*) Once she explained the job to her, however, Plaintiff was able to do the job. (*Id.*) When there were changes to the job or different instructions to be followed, the boss explained the changes to Plaintiff, but if the boss did not explain them correctly or if Plaintiff did not understand them, Arreguin explained them in a manner that Plaintiff understood. (R. 187-88.) Arreguin testified that part of the problem was that the boss would look away when he was speaking and Plaintiff would not understand what he was saying. (R. 188.) Once Arreguin re-explained the instructions, Plaintiff understood. (*Id.*) While they worked together, Arreguin had to consciously speak louder when talking to Plaintiff. (*Id.*) Arreguin also noticed Plaintiff's difficulty understanding when more than one person was speaking in a room because she did not know who was speaking or to whom to look. (*Id.*)

Arreguin maintained a friendship with Plaintiff after they stopped working together. (R. 189.) Arreguin testified that when Plaintiff receives a message on her answering machine she calls Arreguin and holds the phone to the answering machine so that Arreguin can hear the message and tell Plaintiff what was said in the message. (R. 189-90.)

## D. The Vocational Expert's Testimony

Timothy Bobrowski, a vocational expert ("VE"), also testified at the hearing. (R. 46-50, 190-98.) He characterized Plaintiff's prior positions as an office clerk and file/mail clerk as light, semi-skilled work. (R. 190-91.) The VE also characterized Plaintiff's temporary mail clerk position with the federal government as light, semi-skilled work. (R. 191.) The VE noted that the skills Plaintiff used in those positions can be transferred to a position at a sedentary level of exertion. (R. 191.)

The ALJ posed the following hypothetical to the VE:

> A female individual born in 1956 with a 12th grade education who is literate to the English language, and has the skills as you identified a few moments ago as was acquired by [Plaintiff]. Further assume an individual who has no exertional limitations, no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and has an environmental restriction of the need to avoid concentrated exposure to noise. Are there any occupations that such an individual could perform?

(R. 192.)

Based on that hypothetical, the VE opined that Plaintiff would be able to perform her past relevant work as an office clerk, general clerk, or clerical sorter. (*Id.*) Specifically, the VE stated that general clerk positions exist at both the light level (11,000 jobs) and the sedentary level (23,000 jobs). (R. 193.) The VE clarified that in her previous positions, Plaintiff performed general clerk duties as that position is defined in the Dictionary of Occupational Titles (DOT), and that the DOT sometimes intermingles the titles of general clerk and office clerk because a lot of the duties in those jobs are the same. (*Id.*) The VE stated that in addition to her past relevant work, Plaintiff could also perform other clerical duties, mail clerk duties, unskilled work as a janitor (5,400 jobs), and work as a courier (5,000 jobs). (R. 194-95.)

Plaintiff's attorney asked the VE to consider the ALJ's hypothetical, adding that the individual has some communication limitations, such that she cannot understand what someone says

8

to her unless the speaker talks directly to her, that if more than one person is speaking at a time she cannot understand both of them, and that phone work is prohibited due to the hearing impairment. (R. 195.) With that additional information, the VE adjusted his analysis and testified that a portion (50%) of the general clerical jobs and all of the courier jobs would be eliminated because of the inability to use the phone. (R. 195-96.) The VE noted that the office clerk positions and half of the general clerical positions, including mail work duties, would still be available. (R. 196.) Upon further questioning, the VE testified that the scenario of a supervisor who turns away when communicating does not eliminate any jobs because part of semi-skilled work is being able to obtain the information needed to get the job done, whether asking a co-worker to explain instructions or telling the supervisor to look at the worker when talking. (R. 196-98.) The VE admitted that if that is not done, the worker cannot get the job done.[12] (R. 198.) However, he explained that that does not limit jobs because the worker is expected to obtain the information needed to perform the job. (R. 197-98.) Rather, in that situation, the worker should not be placed in a noisy environment and the worker should not be required to use the telephone if the worker cannot use it. (R. 198.)

## THE ALJ'S DECISION

The Social Security Regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. 20 C.F.R. § 416.920. Under this test the Social Security Commissioner must consider: (1) whether the claimant has performed substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the

---

[12] *See* further discussion of that testimony below.

claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the RFC, despite her impairment, to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether the claimant is able to perform any other work existing in significant numbers in the national economy, considering her RFC together with her age, education, and work experience. *Id.; see also Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps one through four; the burden shifts to the Commissioner at step five. *Young*, 957 F.2d at 389.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 12, 2001, her alleged onset of disability date. (R. 16.) At step two, the ALJ found that Plaintiff has a "severe" bilateral hearing impairment. (R. 17.) At step three, the ALJ concluded that Plaintiff's impairment does not meet the requirements or equal the level of severity contemplated for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.*) Between steps three and four, the ALJ assessed Plaintiff's RFC, and concluded that Plaintiff can perform the full range of all exertional level work with the environmental restriction of a need to avoid concentrated exposure to noise. (*Id.*) At step four, the ALJ concluded that Plaintiff could perform her past relevant work as an office clerk and general clerk. (R. 19.) Because the ALJ concluded that Plaintiff could perform her past relevant work, he did not address step five (*i.e.*, whether the claimant is able to perform any other work existing in significant numbers in the national economy). However, as an aside, the ALJ noted the VE's testimony that Plaintiff can work in the national economy. (R. 18.) Specifically, Plaintiff could perform the job of general clerk at a light level (11,000 jobs); general

clerk at a sedentary level (23,000 jobs); and janitor (5,400 jobs). (R. 18-19.) Based on his analysis, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 19.)

## LEGAL STANDARD

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. There, the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210, 1213-14 (N.D. Ill. 1996). Thus, the court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

11

When evaluating a disability claim the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court. *Herr*, 912 F.2d at 181; *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (stating that "[t]he ALJ has the authority to assess the medical evidence and give more weight to evidence he finds more credible"). Where there is a conflict between medical opinions, the ALJ may choose between those opinions, but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996).

Although the district court's role is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria, that does not mean that the ALJ is entitled to unlimited judicial deference. Regardless of whether there is adequate evidence in the record to support the ALJ's decision, the ALJ must build an accurate and logical bridge from the evidence to his conclusions, because the court confines its review to the reasons supplied by the ALJ. *Blakes ex rel Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). If the evidence on which the ALJ relied does not support the ALJ's decision, the decision cannot be upheld. *Id.* The ALJ must state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also Young*, 957 F.2d at 393 (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**DISCUSSION**

Plaintiff raises a number of challenges to the ALJ's finding that she is not disabled. Specifically, Plaintiff argues that: (1) the ALJ erred in failing to include Plaintiff's communicative limitations in the hypothetical posed to the VE even though a state agency physician found such limitations (Pl.'s Mem. at 8-9); (2) the VE's testimony is not substantial evidence to prove that Plaintiff can engage in her past relevant work (*id.* at 9-11); (3) the ALJ erred in failing to call a medical expert to testify as to whether the combination of Plaintiff's impairments met or equaled a listing level (*id.* at 11-14); and (4) the ALJ made an inadequate credibility finding (*id.* at 14-15).

The Commissioner argues that: (1) the ALJ properly found that Plaintiff did not meet or equal Listing 2.08 (Def.'s Mem. at 7-10); (2) any error made by the ALJ in assessing Plaintiff's RFC and credibility, including any inadequacies in the hypothetical posed to the VE, is harmless error because the ALJ's ultimate decision, that Plaintiff is not disabled, is supported by substantial evidence based on other testimony by the VE (*id.* at 10-11); and (3) Plaintiff's past work was substantial gainful activity, and thus the ALJ properly relied on it to conclude that Plaintiff was not entitled to benefits (*id.* at 11-13). In Plaintiff's Reply, she contends that the Commissioner's harmless error analysis would be plausible if the VE's testimony was not "weakened" (i.e., "wounded") at the hearing. (Pl.'s Reply at 4-5; *see also* Pl.'s Mem. at 9.) Because these arguments overlap, they will be addressed in an order different from Plaintiff's Motion.

It appears from Plaintiff's memorandum that the following communicative limitations are at issue: (1) that people have to speak directly to Plaintiff (face-to-face); (2) that people have to speak louder to her; (3) that she has difficulty hearing people on the phone; and (4) that she cannot hear when too many people are speaking at once. (Pl.'s Mem. at 8, 14.)

13

## A.    The Hypothetical Question

Plaintiff argues that the ALJ erred in not including the above limitations in the hypothetical posed to the VE. (*Id.* at 8-9.) The ALJ did not include any communicative limitations in his hypothetical question to the VE, and, in fact, specifically told the VE that there were no communicative limitations, even though the state agency physician found that Plaintiff has communicative limitations because of her hearing. (R. 118, 192.)

It is well established that hypothetical questions posed to the VE ordinarily must include all limitations supported by medical evidence in the record in order to ensure that the VE does not refer to jobs that the applicant cannot perform. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). An exception exists for situations where the VE independently learns of the limitations, such as through additional questioning at the hearing or outside review of the medical records, and presumably accounts for them. *Id.*

Here, even assuming, *arguendo*, that it was error for the ALJ to fail to include communicative limitations in the hypothetical posed to the VE, that error did not impact the determination. After the ALJ posed his hypothetical question to the VE, which included no communicative limitations, Plaintiff's counsel provided the VE with additional limitations including the communicative limitations described above, adding also an inability to use the telephone in her work. (R. 195.) Upon receiving that information, the VE changed the number of jobs available, but still found Plaintiff employable. (R. 195-96.) He testified that, even with those limitations, Plaintiff could perform the duties of an office clerk, mail clerk and half of the general clerical positions (R.

195-96), and also work as a janitor, for which there are 5,400 available jobs. (R. 194-95, 196.)[13] In fact, Plaintiff herself testified that, if given the hours, she would be able to work full-time, both at Jewel as a bagger or at Family Dollar in a position stocking shelves. (R. 177, 178.) The VE received the information Plaintiff believes is relevant during the hearing, and any error by the ALJ was harmless. *See Shramek v. Apfel*, 226 F.3d 809, 813-815 (7th Cir. 2000) (finding ALJ's errors in mischaracterizing a medical opinion and making an insufficient and unsupported negative credibility determination were not prejudicial because, even accepting the limitations set forth by claimant and her treating physician, she was not disabled under the statute); *see also Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) (noting that harmless error doctrine is fully applicable to judicial review of administrative decisions).

## B.     The ALJ's Credibility Determination

Plaintiff argues that the ALJ ignored the testimony that Plaintiff's communicative limitations impact her ability to work, and that the ALJ rendered an inadequate credibility evaluation in his statement that he "did not consider the claimant's testimony concerning pain and functional limitations as credible evidence in reducing the residual functional capacity." (Pl.'s Mem. at 14, quoting R. 19.)    Again, the Commissioner argues that any error in the ALJ's credibility

---

[13] Although the VE testified that Plaintiff's inability to use the telephone would eliminate 50% of the general clerical jobs, he also testified that those positions can be performed at the light level (11,000 jobs) and the sedentary level (23,000 jobs). (R. 193, 195-96.) Adding those positions together, there are a total of 34,000 general clerical jobs available at those two levels. Even cutting this number in half, there would still be 17,000 available jobs in this category of work.

determination is harmless because the ALJ's ultimate decision would remain unchanged. (Def.'s Mem. at 10.)

Where the ALJ determines that a claimant is not credible, the ALJ should explain how the allegations are inconsistent with the medical findings in the record. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The applicable Social Security Ruling requires that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2, 4.

In this case it is not clear that the ALJ found Plaintiff's testimony not credible. What he essentially said was that Plaintiff's testimony did not provide a credible basis for reducing her RFC. (R. 18, 19.) It is not clear from Plaintiff's briefs what testimony she believes the ALJ discredited that, had it been fully credited, would have changed the result. Plaintiff argues that the ALJ "ignored" Plaintiff's testimony about her limitations (Pl.'s Mem. at 14-15), but that is not correct. For example, the ALJ considered Plaintiff's testimony that she has difficulty using the telephone, but also considered her testimony that, although she had a hard time getting used to using the telephone, she is now "doing good on it." (R. 18, 183.) The ALJ also referred to Plaintiff's testimony that she needs to read lips to help her hear. (R. 18.) The ALJ did not say that the testimony was not credible; rather, he concluded that the testimony did not reveal any new limitations not otherwise provided for in the RFC. (*Id.*) To the extent that Plaintiff is arguing that the ALJ's failure to include Plaintiff's communicative limitations in the hypothetical to the VE reflects a discounting of the limitations on the basis of credibility, that argument is inconsistent with

16

the text of the ALJ's decision, which refers to those limitations. Further, as was discussed above, including those limitations would not change the finding that Plaintiff is not disabled. Thus, Plaintiff's argument that the decision should be reversed on this basis is rejected. *See Shramek*, 226 F.3d at 813-15 (finding ALJ's error in making an unsupported negative credibility determination was not prejudicial because, even accepting the limitations set forth by the claimant, she was not disabled under the statute).

## C.    The VE's Testimony

Plaintiff argues that the VE's testimony cannot be used to support the ALJ's decision because the VE's testimony was "wounded" and "weakened" by the VE's answers to questioning by Plaintiff's attorney. (Pl.'s Reply at 4-5; Pl.'s Mem. at 9.) However, Plaintiff's argument is unpersuasive.

As a threshold matter, Plaintiff's memoranda misstate the record by misquoting the questions to and answers of the VE. Plaintiff describes that testimony as discussing instructions to a "deaf person" (presumably, Plaintiff). *See* Pl.'s Mem. at 9; Pl.'s Reply at 6. In fact, there is no evidence that Plaintiff is a "deaf person," and the word "deaf" does not appear at all in the VE's testimony or the questions posed to him.

Secondly, the argument is based on a distortion of the record. During the hearing, Plaintiff's counsel asked the VE whether, for the office clerical jobs and general clerical jobs, on a typical day a person receives oral instructions from supervisors about work assignments. (R. 196.) The VE responded that generally those positions consist of routine work that require additional instructions from "time to time," which can be delivered face-to-face or in written format. (*Id.*) Plaintiff's counsel then asked whether a significant number of jobs would be eliminated if the person had a

supervisor or boss who was unwilling to take the extra time and effort to communicate face-to-face. (R. 197.) The VE explained that that situation would not eliminate any jobs because at a semi-skilled level of employment, a person has to do what is necessary to obtain information needed and that a certain level of accommodation is made in a normal work routine. (R. 197-98.) The attorney asked whether the onus is on the employee to tell the supervisor to turn around during a conversation, to which the VE responded in the affirmative. (R. 198.) Plaintiff's counsel then asked, "[If] [t]hat person doesn't do that what are the consequences?" (*Id.*) The VE responded:

> I guess they couldn't get the job done. But that in and of itself isn't necessarily going to limit jobs to get done. It's . . . a normal thing we do. What you don't want to do is what the hypothetical the judge said, you don't want to put someone in a noisy environment, because then they can't hear. You don't have them use the telephone, because they can't [use] it. In terms of the things that you need to do to get the information, you need to get your job done within your capabilities you do that. That's expected of a person to do.

(*Id.*)

Plaintiff now argues that the VE's testimony is "wounded" because he testified that a person could not get the job done if a supervisor were unwilling to communicate with the person face-to-face. However, the VE's testimony does not support Plaintiff's argument. Plaintiff's counsel's question was ambiguous: It is not clear whether counsel was asking the consequences of the worker's failure to request face-to-face communication or the consequences of a supervisor's refusal to communicate face-to-face. What is clear is that the VE refused to limit further the available jobs based on the scenario suggested by Plaintiff's counsel.

Plaintiff argues that the VE's allegedly "wounded" testimony ultimately did not make a "full enough recovery" to provide substantial evidence to support a conclusion that Plaintiff can perform her prior relevant work. (Pl.'s Mem. at 9, 10.) Plaintiff's argument completely ignores the fact that,

as discussed above, the *claimant* bears the burden of proof at steps one through four; the burden shifts to the Commissioner only at step five. *Young*, 957 F.2d at 389. The burden to demonstrate that Plaintiff cannot perform her past relevant work is a step four determination, and Plaintiff has not demonstrated that the ALJ's conclusion that Plaintiff did not meet her burden should be reversed.

**D.  Plaintiff's past employment as substantial gainful activity**

Plaintiff argues that the assistance she received on the job from her co-worker Arreguin was more than is usually given to people doing similar work, and therefore there is no substantial evidence for the ALJ's finding that her past work was substantial gainful activity. (Pl.'s Mem. at 10-11.) 20 C.F.R. § 404.1573(b) provides in relevant part:

> We consider how well you do your work when we determine whether or not you are doing substantial gainful activity. If you do your work satisfactorily, this may show that you are working at the substantial gainful activity level. If you are unable, because of your impairments, to do ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work, this may show that you are not working at the substantial gainful activity level.

Plaintiff's argument fails to consider the fact that she worked at her past relevant work as an office clerk and general clerk for more than twenty years. She has subsequently worked at two other jobs that fall short of substantial gainful activity only because of the number of hours available for her to work, not the nature of the work. *See* ALJ's opinion at R. 16-17. The VE testified that the work performed in office clerk and general clerk categories is "pretty routine work" and requires "time to time instructions." (R. 196.) Likewise, the VE testified that Plaintiff's seeking out information by asking a supervisor to speak to her directly would be expected. (R. 198.) Thus, Plaintiff has failed to demonstrate any reason to reverse the ALJ's determination that Plaintiff's previous work was substantial gainful activity which she can perform.

**E.     The ALJ's Listing Level Decision and Failure to Call a Medical Expert**

Plaintiff argues that the ALJ erred in finding Plaintiff's hearing impairment does not equal Listing 2.08, and that the ALJ should have called a medical expert to testify as to whether the combination of her impairments equal a Listing level. (Pl.'s Mem. at 11-13.)

The Listing of Impairments describes impairments that are considered severe enough to prevent a person from doing any gainful activity. 20 C.F.R. § 404.1525. If a claimant's impairments meet the specific criteria described in the Listing, the claimant is presumptively disabled. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). A claimant may also demonstrate a presumptive disability by showing that her impairments are equal in severity to those in a section of the Listing. *Id.* The claimant bears the burden of proving her condition meets or equals all of the criteria of that impairment. *Id.* Listing 2.08 requires:

> Hearing impairments (hearing not restorable by a hearing aid) manifested by:
>
> A. Average hearing threshold sensitivity for air conduction of 90 decibels or greater and for bone conduction to corresponding maximal levels, in the *better ear*, determined by the simple average of hearing threshold levels at 500, 1000 and 2000 hz. . . . ; or
> B. Speech discrimination scores of 40 percent or less in the *better ear*.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.08 (emphasis added). Plaintiff concedes that she does not meet Listing 2.08 because the decibel level measurement in her left ear is 35 decibels, as opposed to the 90 decibels needed to meet the Listing, and her speech discrimination score is 80%, as opposed to the 40% needed to meet the Listing. (Pl.'s Mem. at 11-12.) Plaintiff also acknowledges that the Listing "seemingly" looks only at the hearing in the person's better ear to determine whether she meets a Listing. (*Id.* at 11) (emphasis omitted.) However, Plaintiff questions whether the level

20

of hearing in the "bad ear" has any impact on a person's overall hearing ability, even when the "good ear" is not quite at listing level. (Notably, Plaintiff failed to produce any evidence to so demonstrate.) Plaintiff argues that the ALJ took a "narrow" view of Listing 2.08 in only considering Plaintiff's test scores in her "better ear," rather than following Plaintiff's "better view" of considering whether the combined impact of a person's hearing impairments (including the hearing in the "bad ear") meets or equals a Listing. (*Id.* at 12-13.) Thus, Plaintiff argues that the case should be remanded to obtain the testimony of a medical expert in otolaryngology and otology to assist in making the determination of whether her impairments equal a Listing.

Plaintiff's interpretation of Listing 2.08 runs contrary to the language of that Listing, which uses the term "better ear," demonstrating that the regulations already consider that the claimant's condition may be worse in the "bad ear" than the threshold set out for the "better ear." Plaintiff fails to cite any authority that has adopted Plaintiff's view.

20 C.F.R. § 404.1526 discusses how medical equivalence is determined and provides in relevant part:

> We will decide that your impairment(s) is medically equivalent to a listed impairment in Appendix 1 if the medical findings are at least equal in severity and duration to the listed findings. We will compare the symptoms, signs, and laboratory findings about your impairment(s), as shown in the medical evidence we have about your claim, with the medical criteria shown with the listed impairment. . . . If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairments to determine whether the combination of your impairments is medically equal to any listed impairment.

The ALJ or the Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled (SSR 96-6p, 1996 WL 374180 at *3), subject, of course, to review under the appropriate standards. Because a finding of equivalence requires familiarity with

the regulations and legal standard of severity set forth in the regulations, it is an issue reserved to the Commissioner. SSR 96-5p, 1996 WL 374183 at *4. Whether the findings for an individual's impairment meet the requirements of an impairment in the Listing is usually more a question of medical fact than a question of medical opinion. *Id.* at *3. In most instances, the requirements of listed impairments are objective, and whether an individual's impairment manifests those requirements is a matter of documentation. *Id.*

The Commissioner points out that the ALJ relied on the opinion of the state agency medical consulting physician in finding that Plaintiff's impairment does not equal a Listing level. (Def.'s Mem. at 8, citing R. 17.) The ALJ may rely on the opinion of a state agency physician in finding no Listing level impairment. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). When an ALJ finds that an individual's impairment is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by certain documentation signed by a state agency medical consultant. SSR 96-6p, 1996 WL 374180 at *3. However, as trier of the facts, an ALJ is not bound by a finding by a state agency medical consultant as to whether an individual's impairment is equivalent in severity to any impairment in the Listing. *Id.* In fact, the ALJ is required to seek further medical expert evidence on the issue of equivalence: (1) when no additional medical evidence is received, but in the opinion of the ALJ the symptoms, signs, and laboratory findings in the record suggest that a judgment of equivalence may be reasonable; or (2) when additional medical evidence is received that in the opinion of the ALJ may change the medical consultant's finding of no listing equivalence. *Id.* at *3-4. In this case, the ALJ found that there was no new medical evidence that would make the consultant's opinion not current. (R. 17.) Plaintiff does not suggest that there was any new medical evidence.

This case is distinguishable from *Blakes ex rel Wolfe*, cited by Plaintiff, because here the finding that Plaintiff's limitation did not meet or equal the Listing was based on the results of audiologic testing reviewed by the consulting physician, not the assumptions or hunches of the ALJ, as was the case in *Blakes*. *See* 331 F.3d at 569-70.

Plaintiff argues that the holding in *Scheck* that the ALJ may rely on the state agency consultant's opinion regarding Listing level equivalence does not apply here because the ALJ did not rely on the other aspects of the state agency consultant's opinion, specifically the finding of communicative limitations, discussed above. However, it does not follow that the ALJ could not properly rely on the consulting physician's opinion that Plaintiff's impairments do not meet or equal a Listing. Thus, the ALJ's finding that Plaintiff's impairment did not meet or equal a Listing is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted.

Geraldine Soat Brown
United States Magistrate Judge

August **29**, 2005